# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

SAVANNAH STEPHENS,               )
                                 )
       Plaintiff,             )
                                 )
    v.                          )          CAUSE NO.: 1:06-CV-391
                                 )
MICHAEL J. ASTRUE,[1]             )
Commissioner of Social Security,  )
                                 )
       Defendant.             )

## OPINION AND ORDER

Plaintiff Savannah Stephens appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[2] (Docket # 1.) In short, because the Administrative Law Judge ("ALJ") properly discounted the opinion of Stephens's therapist, as well as the testimony of Stephens and her aunt concerning her limitations, the Commissioner's decision will be AFFIRMED.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

Stephens filed an application for SSI on July 29, 2003, alleging a disability onset date of January 2, 1998. (Tr. 46-47.) After her claim was denied initially and upon reconsideration, Stephens requested an administrative hearing. (Tr. 25-26, 39-42.) On August 10, 2005, ALJ

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security; therefore, Michael J. Astrue is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[3] The administrative record in this case is voluminous (310 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this Opinion recounts only the portions of the record necessary to the decision.

Yvonne Stam conducted a hearing at which Stephens, her aunt, a medical expert, and a vocational expert testified. (Tr. 269-310.) The ALJ then rendered an unfavorable decision on June 19, 2006. (Tr. 11-24.) The Appeals Council denied Stephens's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7, 10.) Stephens filed here on December 8, 2006, seeking review of the Commissioner's decision, and the matter is now fully briefed. (Docket # 1, 21-22, 26.)

At the time of the ALJ's decision, Stephens was thirty-eight years old and had an eleventh-grade education. (Tr. 15, 61.) Her past employment experience includes working as a cashier/checker, production worker, retail assistant manager, and fast food worker. (Tr. 15, 105.) She claims she can no longer work due to fibromyalgia, anxiety, depression, back problems, and obesity. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 2.)

### A. Evidence of Physical Impairments

During Stephens's regular visits to Doctor James Haughn, a general practitioner, from July 7, 2000, until August 12, 2003, he recorded Stephens's complaints of pain and prescribed various medications for it. (Tr. 115-23.) On September 2, 2003, Dr. Haughn wrote a "Return to Work/School Authorization" indicating that Stephens needed to take two ten-minute breaks when working a four to six hour shift. (Tr. 113.)

On October 15, 2002, Stephens saw Doctor Stephen Hatch, a pain management specialist, for fibromyalgia. (Tr. 244-45.) Upon examination, Dr. Hatch noted that Stephens had diffuse myofascial pain consistent with fibromyalgia with tender points; however, he also observed good strength and range of motion, as well as intact reflexes. (Tr. 245.) Noting that Stephens had obvious anxiety and depression, Dr. Hatch opined that she would likely benefit

from counseling. (Tr. 245.) He further indicated that weight loss was an "important issue[]" with fibromyalgia. (Tr. 245.) When Stephens next visited Dr. Hatch on April 29, 2005, he opined that "a lot of her pain was strongly related to a psychiatric disease[,]" reiterating that a visit to a psychiatrist who has experience treating patients with chronic pain would be excellent for her. (Tr. 242-43.)

After conducting a consultative examination on October 1, 2003, state agency physician H.M. Bacchus, Jr. concluded that Stephens suffered from fibromyalgia and chronic lower back pain but that she could perform full-time work, could stand for six hours and sit for two hours noncontinuously, and could lift up to ten pounds.[4] (Tr. 133-34.) Subsequently, state agency physician A. Lopez completed a "Physical Residual Functional Capacity Assessment" on October 23, 2003, opining that Stephens could lift twenty pounds occasionally and ten pounds frequently, could stand and/or walk for about six hours in an eight-hour workday, and could sit for about six hours in an eight-hour workday. (Tr. 139.) Dr. Lopez further found that Stephens could occasionally climb, stoop, kneel, crouch, and crawl, but could never balance. (Tr. 140.) Finally, Dr. Lopez concluded that Stephens should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 142.) On November 7, 2004, state agency physician B. Whitley completed another Physical Residual Functional Capacity Assessment, essentially rendering the same opinion as Dr. Lopez, except that Dr. Whitley found that Stephens could occasionally balance and did not need to avoid hazards. (Tr. 166-73.) When asked to explain how the evidence supported his conclusions, Dr. Whitley wrote that Stephens was sixty-three inches tall

---

[4] During the exam, Dr. Bacchus noted that Stephens's height was 5'3" and that her weight was 216 pounds. (Tr. 134.)

3

and weighed two hundred sixteen pounds. (Tr. 167.)

Stephens regularly visited Doctor Philip Johnson, a general practitioner, for medication checks from October 7, 2003, to February 1, 2005. (Tr. 162-65, 205-220, 249-55.) Significantly, in March 2004, Dr. Johnson ordered an MRI of Stephens's cervical spine, which revealed a tiny central disc protrusion at C4-C5 impressing upon the anterior thecal sac but not flattening the cord; thus it was likely an incidental finding. (Tr. 216, 192.) The MRI further indicated generalized disc bulging and mild spurring at C5-C6, which was creating a mild degree of central stenosis although the cervical cord did not appear to be flattened. (Tr. 192.)

On March 2, 2005, Dr. Johnson completed a "Medical Source Statement," noting that Stephens follows medical instructions well. (Tr. 202.) Dr. Johnson also opined that she was responding well to her medications, namely Wellbutrin and Risperdal. (Tr. 203.) Indicating that he agreed with therapist Joy Putt's opinion, detailed *infra*, that Stephens would miss more than four days of work per month due to her mental impairments and treatment, Dr. Johnson qualified this opinion by writing that if Stephens does not take Risperdal, then the next day is bad. (Tr. 203.) Finally, he opined that Stephens's obesity caused an increase in her level of pain. (Tr. 203.)

### B. Evidence of Mental Impairments

On October 20, 2003, Wayne Von Bargen, Ph.D., conducted a mental status examination at the request of the state agency. (Tr. 136-37.) Dr. Von Bargen noted that the content of Stephens's verbalizations was logical, relevant, and coherent but that Stephens was tearful throughout the session. (Tr. 136.) When asked to describe her current difficulties, Stephens replied: "I was diagnosed with fibromyalgia. I have lots and lots of pain. I hurt every single morning. I never get a full night[']s sleep. Pain. My legs [sic] jumping." (Tr. 136.)  She

described a typical day as sitting home by herself. (Tr. 136.) Stephens also relayed that when she tried to work at Target, she left crying several times and the kids who "c[a]me through" would get on her nerves. (Tr. 136.) Although she stated that driving made her upset and nervous, Dr. Von Bargen noted that she drove herself to the evaluation. (Tr. 136.)

After conducting the examination, Dr. Von Bargen wrote that Stephens's history and current prescriptions are consistent with depression and anxiety, largely secondary to her medical problems, and specifically noted her reports of dysphoria, irritability, anxiety in crowds and while driving, poor sleep, social isolation, and suicidal thoughts. (Tr. 137.) Dr. Von Bargen further observed that Stephens appeared to be able to adequately care for herself and perform routine daily activities, although she depended upon friends and relatives for assistance with strenuous tasks. (Tr. 137.) His diagnostic impressions were dysthymic disorder and anxiety disorder, and he rated her Global Assessment of Functioning ("GAF") at 60.[5] (Tr. 137.)

On October 24, 2003, F. Kladder, Ph.D., completed a "Psychiatric Review Technique," opining that Stephens's affective disorders and anxiety-related disorders were not severe. (Tr. 146.) Dr. Kladder also found that Stephens had only mild limitations in the areas of (1) restriction of activities of daily living and (2) difficulties in maintaining social functioning, and she had no limitations in the areas of (1) difficulties in maintaining concentration, persistence, or pace and (2) episodes of decompensation each of extended duration. (Tr. 156.)

On November 25, 2003, Stephens first visited therapist Joy Putt for depression and

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000) (hereinafter "*DSM-IV-2000*"). "In most instances, ratings on the GAF Scale should be for the current period (i.e., the level of functioning at the time of the evaluations)" and "may be particularly useful in tracking the clinical progress of individuals in global terms . . . ." *Id.* at 32-33. A GAF of 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* at 34.

5

anxiety. (Tr. 197-98.) Stephens reported that she was divorced one year ago and lived alone, stating that although she was lonely, she felt nervous if she was around people for a long length of time. (Tr. 197.)

Noting that Stephens was on several pain medications, Putt expressed concern that she might have some substance dependency issues and recommended a Substance Abuse Subtle Screening Inventory to rule out any prescription drug dependency issues. (Tr. 197-98.) Putt further observed that Stephens exhibited several signs of depression including tearfulness, suicidal ideations, depressed appearance, weight gain, and loss of energy. (Tr. 197.) Listing Stephens's "main problems" as depression, anxiety, low self-esteem, grief issues, health problems, and possible prescription drug addiction, Putt diagnosed  major depressive disorder, recurrent, severe without psychotic features; social phobia; and dependent personality disorder. (Tr. 197-98.) She also rated Stephens's current GAF at 44.[6] (Tr. 197.) Putt recommended that Stephens address her self-esteem issues during individual sessions to help reduce depressive symptoms, anxiety issues, and dependency issues. (Tr. 198.)

On January 1, 2004, J. Gange, Ph.D., completed another "Psychiatric Review Technique" for the state agency. (Tr. 174-87.) She opined that Stephens had only mild limitations in the areas of (1) restriction of activities of daily living and (2) difficulties in maintaining concentration, persistence, or pace. (Tr. 184.) Dr. Gange further found that Stephens had moderate limitations in the area of difficulties in maintaining social functioning. (Tr. 184.) On January 7, 2004, Dr. Gange completed a "Mental Residual Functional Capacity Assessment,"

---

[6] A GAF of 44 reflects "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *DSM-IV-2000* at 34.

opining that Stephens was not significantly limited in nineteen mental activities but that Stephens was moderately limited in the ability to interact appropriately with the general public. (Tr. 188-89.)

On February 3, 2004, Putt wrote that Stephens was taking steps to improve her self-esteem, and on February 19, 2004, she observed that Stephens's self-esteem had improved and that she says mainly positive things about herself. (Tr. 240.) In a May 17, 2004, note, Putt stated that although Stephens's self-esteem had improved, it declined after she did not attend counseling for a period of time. (Tr. 239.) On June 8, 2004, Putt noted no changes since her last review. (Tr. 239.) Putt observed on July 9, 2004, that although Stephens was taking steps to improve her self-esteem, she had been traumatized in the past, which was affecting her current state of well-being and was making it difficult for her to focus on self-esteem issues. (Tr. 239.)

On September 15, 2004, Putt wrote to Dr. Johnson that Stephens showed symptoms of prescription medication dependence, encouraging Dr. Johnson to assess Stephens's medical status and wean her off of any medications that do not seem appropriate for her health. (Tr. 195.) She also recommended that Stephens participate in the "Women In Recovery Program."[7] (Tr. 195.)

In a "Diagnostic Review/Update" dated October 1, 2004, Putt rated Stephens's GAF for a time frame of one year at 52.[8] (Tr. 241.) On October 8, 2004, Putt noted that Stephens was able to make it through the session without extreme mood swings, and on November 4, 2004, she

---

[7] During a March 10, 2005, session with Putt, Stephens reviewed and signed a substance abuse treatment plan. (Tr. 264.)

[8] A GAF score of 52 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

wrote that Stephens's mood seemed to be more stable. (Tr. 236.) Stephens reported on December 10, 2004, that the Risperdal she was taking was helpful, with Putt observing that Stephens's mood appeared more stable than it did previously. (Tr. 236.) Although Putt noted some improvement in Stephens on February 10, 2005, Stephens confided that she still went through periods of up to one week where her mood was unstable on a daily basis. (Tr. 235.) Stephens further reported on April 11, 2005, that she frequently felt angry, but Putt noted that she was not tearful during the session and her mood appeared to be stable. (Tr. 262.)

On April 18, 2005, Putt completed a "Mental Impairment Questionnaire," writing that Stephens suffered from social phobia, major depressive disorder with psychotic features, and borderline personality disorder. (Tr. 222.) When choosing from a list of signs and symptoms associated with this diagnosis, Putt notably did not select "Substance dependance." (Tr. 222.) Putt then rated both Stephens's current GAF and highest GAF for the past year at 55.[9] (Tr. 222.) Opining that Stephens would miss more than four days of work per month due to her impairments or treatment, Putt also indicated that Stephens's mental functioning would decrease if she returned to full-time work. (Tr. 224.) She further found that Stephens had "no useful ability to function" in the following work-related mental activities: understanding and remembering detailed instructions, carrying out detailed instructions, working with or near others without being distracted by them, completing a normal workday or workweek, interacting appropriately with the public, accepting instructions and responding appropriately to criticism from supervisors, and traveling to unfamiliar places or using public transportation. (Tr. 225-26.)

---

[9] A GAF score of 55 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

On June 6, 2005, Stephens reported to Putt that she was still experiencing mood instability and that she was tearful several times a day. (Tr. 261.) Putt observed on July 11, 2007, that Stephens's mood seemed somewhat stable, although she became tearful at times. (Tr. 260.)

At the administrative hearing conducted on August 10, 2005, Doctor Patrick Utz testified as a medical expert concerning Stephens's psychological limitations. (Tr. 288-300.) Dr. Utz noted the contrast between the state agency physician reports through October 2003, which indicated that Stephens's mental impairments were not severe and that she had a GAF of 60, and Putt's opinion rendered in April 2005, which included "some major diagnoses . . . but still with a GAF of 52." (Tr. 292.) Dr. Utz testified that upon review of Putt's treatment notes, it was not evident to him how Stephens's condition became "so much worse" in the interval between October 2003 and April 2005. (Tr. 292.)

Regarding Stephens's limitations in mental functioning, Dr. Utz essentially testified that Stephens had only mild limitations or no limitations at all, except that she had "a little more problems" in the area of social functioning. (Tr. 293-96.)  Specifically, he opined that Stephens should not be working with the general public and should not have more than brief and superficial contact with co-workers and supervisors, and that her supervisors should be sensitive to her difficulty coping with stress and change. (Tr. 295.) Nevertheless, Dr. Utz also testified that Stephens would have no limitations with respect to her ability to complete a normal workday and work week without interruptions from psychologically based symptoms. (Tr. 296.)

**C. Administrative Hearing Testimony Concerning Stephens's Alleged Limitations**

At the administrative hearing, Stephens described her limitations. (Tr. 272-85.) Specifically, she testified that doing the dishes is a problem for her, as she can only stand and

bend over long enough to wash two or three cups. (Tr. 276-77.) She further reported that she is unable to make the bed because she has trouble throwing and pushing the covers. (Tr. 276.) Stephens indicated that her aunt has been cleaning her house for the past three or four years. (Tr. 280.) In addition, she testified that she is only able to lift between five to ten pounds, sit in a chair for fifteen to twenty minutes before standing or moving, stand for fifteen to twenty minutes before moving, and walk on a treadmill for about three to five minutes at a slow speed. (Tr. 276-77.)

Reporting that she has difficulty staying asleep at night, Stephens explained that she is up six to eight times throughout the night because she has leg cramps and because her "right side goes to sleep a lot." (Tr. 281-82.) She further testified that she feels "terrible" and unrefreshed in the morning, specifically stating that she feels stiff and "hurt[s] like crazy." (Tr. 282-83.) In addition, Stephens reported that she takes about ten to thirty short naps per day, which last for about ten to twenty minutes. (Tr. 283.)

Stephens's aunt, Linda Collins, also testified at the hearing, explaining that she visits Stephens for about four or five hours at least three days per week and has phone conversations with her several times a day. (Tr. 286-87.) Collins stated that she does all of Stephens's housekeeping, including her yard work. (Tr. 286.) When asked if there was anything else she would add to Stephens's testimony regarding her limitations, she replied in the negative. (Tr. 287.)

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## III. DISCUSSION

### A. Legal Framework

Under the Act, a claimant is entitled to SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

11

In determining whether Stephens is disabled as defined by the Act, the ALJ conducted the

familiar five-step analytical process, which required her to consider the following issues in

sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a

severe impairment; (3) whether the claimant's impairment meets or equals one of the

impairments listed by the Commissioner, *see* 20 C.F.R. § 416, Subpt. P, App. 1; (4) whether the

claimant is unable to perform her past work; and (5) whether the claimant is incapable of

performing work in the national economy.[10] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270

F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps

three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886

(7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads

to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at

every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

In a written decision issued on June 19, 2006, the ALJ determined that Stephens was not

disabled. (Tr. 14-24.) The ALJ decided in Stephens's favor on steps one and two, finding that her

fibromyalgia, back pain/strain, dysthymia, and generalized anxiety disorder were severe

impairments; however, the ALJ found at step three that Stephens did not meet or medically equal

a listing. (Tr. 22-23.) She then ascertained that Stephens had the following RFC:

The claimant retains the residual functional capacity to perform light work

---

[10] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e); 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 416.920(e).

activities, provided she is allowed to alternate between sitting and standing
positions. As to her mental residual functional capacity for work the claimant is
mildly limited in her abilities to engage in daily activities, concentrate, persist and
keep pace. She is close to being moderately limited in her abilities to maintain
social functioning, interact appropriately with [the] general public, accept
instructions and respond appropriately to criticism from supervisors and get along
with co-workers or peers without distracting them or exhibiting behavioral
extremes.

(Tr. 23.) When determining Stephens's RFC, the ALJ found that Stephens's allegations
regarding her limitations were not totally credible, and she also did not give great weight to
Collins's testimony. (Tr. 21, 23.) Moreover, the ALJ discounted Putt's opinion while giving
greater weight to Dr. Utz's testimony and the opinions of the state agency psychologists. (Tr. 18-
20.)

Based on her RFC determination, the ALJ found at step four that Stephens was unable to
perform any of her past relevant work. (Tr. 23.) Nevertheless, the ALJ determined at step five
that there were a significant number of jobs in national economy that she could perform,
including an electrical accessory assembler, electronics worker, and assembler of small products.
(Tr. 23.) Therefore, Stephens was not entitled to SSI. (Tr. 24.)

Stephens argues that a remand of the Commissioner's decision is required because the
ALJ improperly evaluated Putt's opinion, her testimony, and Collins's testimony. None of these
arguments is successful.

## C. The ALJ Properly Evaluated Putt's Opinion

Because therapists are not "acceptable medical sources," their opinions are not subject to
analysis under the treating source rule and are therefore never entitled to controlling weight.[11] 20

---

[11] Moreover, Putt's opinion concerning Stephens's ability to perform work-related mental activities
concerns an issue that is reserved to the Commissioner and is also "never entitled to controlling weight or special
significance." SSR 96-5p; *see also* 20 C.F.R. § 416.927(e).

C.F.R. § 416.913(a) (providing that licensed physicians, licensed or certified psychologists,

licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are

acceptable medical sources); 20 C.F.R. § 416.927(a)(2), (d) ("Medical opinions are statements

from physicians and psychologists or other acceptable medical sources . . . ."); *Barrett v.

Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (noting that the claimant was "wrong to argue

that a physical therapist's report should be given controlling weight"); *Patterson v. Barnhart*,

428 F. Supp. 2d 869, 883 (E.D. Wis. 2006). Instead, the opinions of therapists are categorized as

"other sources" of evidence that an ALJ "may" use "to show the severity of [the claimant's]

impairments and how it affects [the claimant's] ability to work."[12] 20 C.F.R. § 416.913(d);

*Patterson*, 428 F. Supp. 2d at 883 (E.D. Wis. 2006).

Here, the ALJ decided not to afford "great weight" to Putt's opinion, basing his

determination on Dr. Utz's testimony, the opinions of the state agency psychologists, and Putt's

treatment records. (Tr. 18.) Specifically, the ALJ relied on Dr. Utz's testimony that Putt's

treatment notes did not evince a worsening in Stephens's condition between 2003, when the state

agency psychologists rated her GAF at 60, and 2005, when Putt rendered her opinion of

debilitating limitations. (Tr. 292.) The ALJ then wrote: "Dr. Utz further testified that [Putt's]

treatment notes were reflective of medical improvement which is also inconsistent with . . .

[Putt's] assessment." (Tr. 18.) Later, after summarizing Putt's treatment records, the ALJ

determined that those records did not support Putt's specific opinion that Stephens would miss

more than four days of work. (Tr. 20.)

---

[12] Stephens contends that SSR 06-03p guides the evaluation of the opinions of "other sources," but she does not explain how the ALJ failed to follow this Ruling when discounting Putt's opinion. *See Burling v. Barnhart*, No. 01 C 3189, 2002 WL 731129, at *8 (N.D. Ill. Apr. 24, 2002) ("[T]he courts need not entertain undeveloped and perfunctory arguments no matter what the issue.").

Stephens first argues that the ALJ should not have relied on Dr. Utz's testimony to discount Putt's opinion. Specifically, Stephens argues that Dr. Utz's testimony was faulty because he "missed" evidence of the "episodic" nature of her mental impairments that allegedly supports Putt's opinion of debilitating limitations.[13] (Reply Br. 3.) This argument is flawed because Stephens's assertion that her impairment is "episodic" is nothing more than an invitation for the Court to play doctor. *See Credit v. Barnhart*, No. 01 C 9406, 2002 WL 1732370, at *5 (N.D. Ill. July 25, 2002) (noting that the court should not attempt to "play doctor" (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996))).

To explain, Stephens points out that Putt diagnosed her with "Major Depressive Disorder," a disorder that is characterized by two or more "Major Depressive Episodes."[14] *DSM-IV-2000* at 376. Stephens suggests that simply because she was diagnosed with Major Depressive Disorder, then she must have experienced Major Depressive Episodes leading up to Putt's April 2005 opinion. (*See* Reply Br. 2 ("Major Depressive Disorder is suggestive of episodic problems.").) By her own admission, however, the course of Major Depressive Disorder is "variable," as "[s]ome people have isolated episodes that are separated by many years . . . where others have clusters of episodes" (Reply Br. 2 (quoting *DSM-IV-2000* at 372)). There is no indication in Putt's notes that Stephens had any Major Depressive Episodes as that term is

---

[13] Dr. Utz specifically testified that he reviewed Stephens's medical record, including Putt's treatment notes (*see* Tr. 288, 292); thus the proposition that Dr. Utz "missed" evidence is questionable. Instead, Stephens is ostensibly contesting the conclusions that Dr. Utz drew from that evidence.

[14] A Major Depressive Episode is defined as "a period of at least 2 weeks during which there is either a depressed mood or the loss of interest or pleasure in nearly all activities." Moreover, "[t]he individual must also experience at least four additional symptoms drawn from a list that includes changes in appetite or weight, sleep, and psychomotor activity; decreased energy; feelings of worthlessness or guilt; difficulty thinking, concentrating, or making decisions; or recurrent thoughts of death or suicidal ideation, plans, or attempts." *DSM-IV-2000* at 349.

medically defined, and there certainly is no suggestion that Stephens was experiencing frequent "clusters" of such Episodes.

In fact, Putt's clinical notes prior to her April 2005 opinion generally reflect a pattern of stabilization and improvement in Stephens's mood and self-esteem, except for a brief period in early 2004 when Stephens did not attend counseling. Stephens's self-characterization of her depression as "episodic" is seemingly based on nothing more than her subjective complaint on February 10, 2005, that she went through periods of up to one week where her mood was unstable on a daily basis and her complaint on April 11, 2005, that she frequently felt angry.[15] Despite these subjective complaints, Putt observed some improvement in Stephens during her February appointment and noted during the March session that her mood appeared to be stable. Accordingly, her argument that Dr. Utz failed to appreciate the "episodic" nature of her impairments fails.

Moreover, even accepting Stephens's speculation that her condition was "episodic," she still fails to link this proposition to her argument that Dr. Utz's testimony was flawed. To explain, Dr. Utz testified that there was nothing in Putt's treatment notes that would explain how Stephens's mental condition deteriorated from the time the state agency physicians rendered their opinions of minimal limitations in October 2003 until Putt rendered her opinion of disabling limitations in April 2005. Although Stephens asserts that the "episodic" nature of her

_____

[15] Stephens also supports her claim of an "episodic" mental impairment with Putt's June 6, 2005, and July 11, 2005, clinical notes. However, her reliance on these notes is faulty for several reasons. For example, she mischaracterizes the June 6, 2005, note, stating that she was tearful several times *during the session*, a contention that is unsupported by the record. Moreover, although Putt personally observed on July 11, 2007, that Stephens became tearful at times, she also concluded that Stephens's mood seemed somewhat stable. Most importantly, those sessions have no import on Putt's April 2005 opinion of debilitating limitations, as they came *after* the opinion was rendered.

impairment supports Putt's opinion, she points to no evidence revealing how her mental condition was any better at the time the state agency physicians rendered their less restrictive limitations. Indeed, much of the behavior that Stephens uses to support Putt's opinion was also observed by the state agency physicians, namely that she was tearful during the appointments and that she complained of mood instability, social anxiety, and isolation. Accordingly, there is nothing inherently faulty about Dr. Utz's testimony, and thus the ALJ was entitled to rely on it when discounting Putt's opinion.[16]

In any event, the ALJ specifically considered virtually all of the treatment notes that Stephens now uses to support her contention that her mental impairments were "episodic" in nature.[17] (*See* Tr. 19-20.) Accordingly, her current attempt to spin Putt's treatment notes to her own advantage is nothing more than an invitation for the Court to re-weigh the evidence and substitute its judgment for that of the ALJ concerning the inferences to be drawn from those notes, an invitation that the Court must decline. *Clifford*, 227 F.3d at 869 ("In our substantial evidence determination, we review the entire administrative record, but do not . . . substitute our own judgment for that of the Commissioner.").

Stephens next argues that the ALJ should not have relied on the state agency physicians' opinions to discount Putt's opinion. Specifically, Stephens asserts that the state agency

---

[16] Stephens's final attack on Dr. Utz's testimony is that he "failed to mention the opinion of Ms. Putt that if Ms. Stephens would return to full-time work . . . her mental functioning would decrease." (Opening Br. 19.) However, Dr. Utz's testimony questioning Putt's opinions ostensibly envelopes this opinion, and in any event, Stephens fails to explain how her argument necessitates a remand of the ALJ's decision. *See Burling*, 2002 WL 731129, at *8 ("[T]he courts need not entertain undeveloped and perfunctory arguments . . . .").

[17] In his summary of Putt's treatment records, the ALJ specifically accounted for the sessions conducted in May, June, July, November, and December of 2004 and in February, April, June, and July 2005. Curiously, Stephens contends that the ALJ engaged in selective review of the evidence by only accounting for Putt's May 2004 treatment note, an argument that is obviously unsupported by the record.

physicians reached their opinions before she began her counseling sessions with Putt and before Putt rendered an opinion of debilitating limitations; therefore the state agency physicians could not have considered this evidence when they opined that Stephens had only minimal limitations. Stephens, however, provides no legal explanation for why this results in the ALJ's improper reliance on the state agency physicians' opinions. Indeed, insofar as the state agency physicians' opinions conflict with Putt's opinion, the ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's argument that the ALJ should not have given greater weight to an earlier mental examination than to one conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do"). Moreover, Stephens fails to explain how Putt's records would have changed the state agency physicians' opinions since, as Dr. Utz indicated, there is nothing in those records to suggest that Stephens's condition deteriorated from the time of the state agency physicians' opinions to the time of Putt's opinion.

Stephens's final argument concerns the ALJ's reliance on GAF scores. Specifically, she contends that GAF scores cannot indicate improvement in her condition,[18] nor can they demonstrate internal inconsistency in Putt's opinion, because they are merely a "snapshot." Although her argument is not entirely clear, Stephens is apparently contending that because GAF scores are only a "snapshot" of how well an individual is functioning at the precise time of an evaluation, she could have been functioning well at the time Putt rated her GAF yet be

---

[18] Contrary to Stephens's argument, the *Diagnostic & Statistical Manual of Mental Disorders* provides that GAF scores "may be particularly useful in tracking the clinical progress of individuals in global terms . . . ." *DSM-IV-2000* at 32.

functioning at disabling levels at other times, and it was those times that Putt accounted for when rendering her opinion of debilitating limitations.[19]

As with her other arguments, this argument is also unconvincing. To explain, at the time of Stephens's initial evaluation in November 2003, Putt rated her GAF at 44, and in October 2004, Putt opined that Stephens's GAF had improved to a 52, specifically indicating that this score applied to a one-year time frame. Thus, contrary to Stephens's arguments, the latter GAF was not merely a "snapshot" applicable to only a short time frame but instead reflected her level of functioning over an extended period of time. In April 2005, Putt rated Stephens's current GAF and highest GAF for the past year at 55, another improvement. Indeed, in the six months between the October 2004 and April 2005 GAFs, Putt's notes indicated either stability or improvement in Stephens's condition, not the "episodic" decline in her condition as Stephens suggests.[20] Thus, the ALJ properly relied on the GAF scores as an indicia of improvement in Stephens's condition that was inconsistent with Putt's opinion of disabling limitations.

In sum, Stephens presents no arguments that would require a remand of the ALJ's decision for a reconsideration of Putt's opinion, an opinion which, in any event, was not entitled to controlling weight or special significance. *See* 20 C.F.R. §§ 416.913(a), 416.927(a)(2), 416.927(d), 416.927(e); SSR 96-5p.

### D. The ALJ Properly Evaluated Stephens's Credibility

---

[19] Specifically, Stephens argues that "GAF[s] are merely snapshots and the record reflects a condition that fluctuates." (Opening Br. 18.) As discussed *supra*, Stephens's argument concerning her "episodic" condition fails.

[20] Specifically, Putt noted on October 8, 2004, that Stephens was able to make it through the session without extreme mood swings; on November 4, 2004, that her mood seemed to be more stable; on December 10, 2004, that her mood appeared more stable than it did previously; on February 10, 2005, that she had improved; and on April 11, 2005, that her mood appeared to be stable. (Tr. 235-36; 262.)

Because the ALJ is in the best position to evaluate the credibility of a witness, her determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ found that the treatment records regarding Stephens's physical impairments "support the claimant's allegation of chronic pain . . . but do not support her allegations of significantly limited physical capacities." (Tr. 17.) The ALJ noted essentially normal test results and physical findings, specifically writing that the results of the MRI "do not support limited physical capabilities to the extent the claimant testified to." (Tr. 17.) The ALJ further discredited Stephens on the basis of the lack of aggressive treatment for her condition and because she abused prescription medications. (Tr. 17-18, 21.) Finally, the ALJ concluded that the record did not establish that Stephens's pain was aggravated by her weight. (Tr. 21.) Stephens attacks each of these reasons offered by the ALJ to discredit her and claims that the ALJ committed an additional error by not considering her physical and mental conditions in combination.

Stephens first contests the ALJ's observation that her physical impairments "support the

20

claimant's allegation of chronic pain . . . but do not support her allegations of significantly limited physical capacities." (Tr. 17.) Specifically, she contends that this finding was legal error because the ALJ did not consider the many references in the treatment records to her pain, arguing that because she has fibromyalgia, her complaints of pain are not subjective symptoms but instead are medical signs that support her testimony of limited physical capabilities.

In support of her arguments, Stephens cites to SSR 96-4p, which provides:

> No symptom or combination of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, *the individual must be found not disabled at step 2* of the sequential evaluation process . . . .

SSR 96-4p (emphasis added). Although subjective symptoms are normally insufficient to support a finding at step two that an individual suffers from a severe impairment, when symptoms such as pain "can be shown by medically acceptable clinical diagnostic techniques," they are deemed to be medical "signs" that can support a step two finding. SSR 96-4p n.2.

As emphasized above, the section of SSR 96-4p that Stephens employs to support her argument applies to the ALJ's finding at step two, a finding that Stephens does not challenge, undoubtedly because the ALJ determined that Stephens's fibromyalgia was a severe impairment. Instead, Stephens argues that SSR 96-4p controls the ALJ's credibility determination, with no explanation of how this Ruling applies beyond step two.[21] Thus, her argument that the ALJ committed legal error stumbles over a hurdle right out of the gate.

Moreover, contrary to her assertions, the ALJ specifically accounted for the numerous complaints of pain contained in her doctors' treatment records. (*See* Tr. 16-17.) In fact, the ALJ

---

[21] In fact, SSR 96-7p, which governs credibility determinations, speaks of pain only as a "symptom," not as a "medical sign."

wrote that the treatment records "support [her] allegation of chronic pain," and later found that Stephens "does experience significant levels of pain." (Tr. 17, 21.) But the ALJ was under no obligation to accept Stephens's allegations of physical limitations merely because he credited her allegations of pain, as the ALJ "need not totally accept or totally reject the individual's statements." SSR 96-7p; *see also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (upholding an ALJ's credibility determination where the "ALJ found that [the claimant] did indeed suffer some pain from her [fibromyalgia] . . . but not to the debilitating extent that she alleged"); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (observing that in most cases fibromyalgia is not disabling).

Stephens next asserts that the ALJ should not have relied on the MRI of her cervical spine to discredit her testimony of physical limitations, as such findings "say nothing about" her fibromyalgia. (Opening Br. 21.) This argument ignores the fact that her claim for disability is not based solely on fibromyalgia, but on back problems as well. In fact, Stephens specifically testified that she is unable to wash dishes because she has difficulty bending over; thus, she is clearly alleging that her back problems cause at least some physical limitations.[22] Accordingly, there is nothing "patently wrong" with the ALJ's decision to discredit Stephens based on her MRI results, particularly since the ALJ is supposed to consider laboratory findings when rendering a credibility determination.[23] *See* SSR 96-7p (listing laboratory findings as one factor

---

[22] Indeed, Stephens admits that "more than just her fibromyalgia symptoms lead to her disability." (Reply Br. 3.)

[23] Although the ALJ noted essentially normal test results and physical findings throughout her summary of the record, she also wrote that she was "not unmindful that standard test results are generally in the normal range for individuals with fibromyalgia." (Tr. 20); *see also Sarchet*, 78 F.3d at 306 ("There are no laboratory tests for the presence or severity of fibromyalgia."). Consequently, the ALJ did not rely solely on the absence of abnormal test results and medical findings when discrediting Stephens's allegations of extreme physical limitations. For example,

to consider when assessing credibility).

Stephens likewise attacks the ALJ's dependence on the lack of aggressive treatment measures as a means to discredit her.[24] Stephens asserts that the ALJ should not have discounted her testimony on this basis because "aggressive treatment is generally not appropriate for fibromyalgia." (Opening Br. 21.) As noted *supra*, however, Stephens is not merely asserting that she is disabled because of fibromyalgia. Moreover, SSR 96-7p lists the type of treatment that a claimant receives as an appropriate factor to consider when rendering a credibility determination, and nothing in this Ruling provides an exception for fibromyalgia. Accordingly, there is nothing "patently wrong" with the ALJ's decision to discredit Stephens based on the lack of aggressive treatment. *See Miller v. Astrue*, No. 05-4409, 2007 WL 1452966, at *2 (8th Cir. May 18, 2007) (determining that the ALJ properly discounted the claimant's assertion that she was unable to work because of fibromyalgia and back pain because the ALJ's finding was supported by the lack of aggressive medical treatment).

Next, Stephens attacks the ALJ's credibility determination because she believes the ALJ improperly evaluated how her obesity affected her pain. In that regard, the ALJ wrote: "Dr.

---

the ALJ noted that the Dr. Haughn and Dr. Johnson rendered limitations no greater than those rendered by the state agency physicians. (Tr. 21); *see also* 96-7p (listing statements from treating physicians as one factor to consider when assessing credibility). Moreover, the ALJ gave "due consideration" to information from third parties, including statements from her former employer, ultimately concluding that these statements "do not support the presence of disabling pain." (Tr. 20-21); *see also* 96-7p ("Other sources may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements.").

[24] Specifically, the ALJ wrote:
In finding that the claimant's physical capabilities are not as limited as she testified to, the [ALJ] further notes that her treatment has primarily consisted of medication therapy versus more aggressive forms of treatment. The [ALJ] also notes that the specialists' recommendations for treatment were conservative in nature which, in turn, suggests that the claimant's physical impairments were not that limiting.

(Tr. 17-18.)

Johnson did not assess any specific limitations other than to state that the claimant's obesity increased her pain. The record shows that the claimant is obese, but does not establish that her pain is aggravated by her weight." (Tr. 21.) Stephens attacks the second sentence, arguing that the "record does establish that obesity worsened her pain" (Opening Br. 22), but curiously supports her assertion with Dr. Johnson's opinion, which she claims the ALJ "ignored." (Reply Br. 5.) Clearly, the ALJ considered Dr. Johnson's opinion, rejecting it because it was not supported by the record. *See Rice v. Barnhart*, 384 F. 3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading").[25]

Stephens also suggests that the ALJ committed legal error by failing to consider the incremental effects of her obesity on her disability as mandated by SSR 02-01p. Contrary to Stephens's assertions, the ALJ did explicitly consider the incremental effects of her obesity, finding that her pain is not aggravated by her weight. In fact, the ALJ also implicitly considered her obesity when he predicated his ultimate RFC determination on the state agency physicians' opinions, who found that Stephens was capable of performing light work despite her weight. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding that the ALJ's failure to explicitly consider the claimant's obesity was harmless error because the ALJ implicitly considered this condition through the adoption of opinions of doctors who were aware of her

---

[25] Perhaps realizing her mistake, Stephens hedges her argument in her Reply Brief, arguing that the ALJ did not properly evaluate Dr. Johnson's medical opinion according to 20 C.F.R § 416.927(d). This argument, however, comes too late and is waived. *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (emphasizing that "arguments that are raised for the first time in a reply brief are waived").

Stephens also supports her argument with Dr. Hatch's note that weight loss is an important issue with fibromyalgia, a note that the ALJ accounted for in his opinion. (Tr. 18.) Accordingly, Stephens's argument is seemingly nothing more than an invitation for the Court to re-weigh the evidence concerning her obesity. *See Clifford*, 227 F.3d at 869.

obesity); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (same).

Stephens's last attack on the ALJ's credibility determination is that the ALJ committed legal error by failing to consider her mental impairments in combination with her physical impairments to determine if her mental impairments made her physical impairments worse.[26] Stephens, however, offers little explanation for the basis of her argument: "Dr. Hatch found that quite a bit of her pain was strongly related to her psychiatric disease. The ALJ failed to mention Dr. Hatch's opinion and to evaluate it in determining her credibility." (Opening Br. 23 (internal citation omitted).)

Contrary to Stephens's assertion, the ALJ specifically mentioned the opinion of Dr. Hatch in her decision, writing that Dr. Hatch "commented that [Stephens's] pain was strongly related to psychiatric disease . . . ." (Tr. 18.) The ALJ immediately followed-up this observation by launching into lengthy discussion concerning Stephens's mental impairments, significantly noting along the way Dr. Utz's opinion that Stephens did not suffer from a pain disorder.[27] The ALJ concluded her evaluation of the evidence by acknowledging that Stephens experienced

---

[26] Stephens's reliance on *Mendez v. Barnhart*, 439 F.3d 360 (7th Cir. 2006) and *Gentle v. Barnhart*, 430 F.3d 868 (7th Cir. 2005) as the a basis for overturning the ALJ's credibility determination seems misplaced. Both cases found that the ALJ's failure to consider the totality of a claimant's impairments necessitated remand because the omission potentially impacted the ALJ's determination regarding the claimant's ability to work, not because it impacted the ALJ's credibility determination. *See Mendez*, 439 F.3d at 363 ("The [ALJ] should have considered whether [the claimant's] difficulty in getting around would interact with her cognitive limitations and her psychiatric condition to make her incapable of complying with even simple workplace directives."); *Gentle*, 430 F.3d 868-69. Indeed, Stephens fails to explain how the ALJ's alleged failure to consider her impairments in combination has any impact on the ALJ's decision to discredit her.

[27] Pain disorder occurs when "[p]sychological factors . . . play a significant role in the onset, severity, exacerbation, or maintenance of the pain." *DSM-IV-2000* at 498. Accordingly, Dr. Utz's opinion that Stephens did not suffer from a pain disorder is seemingly in direct conflict with Dr. Hatch's opinion that Stephen's pain was strongly related to her psychiatric problems. As discussed *supra*, the ALJ afforded Dr. Utz's opinion great weight; therefore, by giving great weight to Dr. Utz's opinion that Stephens did not suffer from a pain disorder, the ALJ implicitly considered the impact that Stephens's psychological impairments had on her pain. *See Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504.

significant levels of pain, and ultimately she rendered an RFC determination that included both physical and mental limitations. Thus, the ALJ did not turn a blind eye to the effects that Stephens's pain and psychological problems had on her ability to work. *Cf. Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the weight issue with the aggregate effect of her other impairments.").[28]

**E. The ALJ's Evaluation of Collins's Testimony Does Not Necessitate Remand**

Before rendering her RFC determination, the ALJ decided not to give great weight to Collins's testimony because of her close relationship to Stephens and the "likelihood of biased testimony." (Tr. 21.) Stephens asserts that this decision was based on an "error of fact or logic" because the ALJ did not support it with any evidence of bias. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) ("[O]rdinarily a trier of fact's credibility finding is binding on an appellate tribunal. But not if the finding is based on errors of fact or logic."). However, it is unnecessary to consider Stephens's argument because the ALJ also found that Collins's testimony "corroborated" Stephens's own testimony concerning her limitations. (Tr. 16.)

To explain, although an ALJ "need not evaluate in writing every piece of testimony and evidence submitted," when an ALJ ignores an entire line of evidence, his decision falls "below

---

[28] Although Stephens's attacks on the ALJ's credibility determination are largely unsuccessful, she does launch one arrow that hits the mark, that is, her argument that the ALJ should not have discredited her based on her abuse of prescription pain medications. The ALJ's bald assertion that "the presence of prescription medication abuse . . . undermines the claimant's credibility" (Tr. 21) is unconvincing because she fails to explain how Stephens's abuse of prescription pain medications dashes her credibility, particularly since Stephens signed a substance abuse treatment plan and the record contains no indication that she failed to follow through with it. Thus, the ALJ's path of reasoning cannot be traced on this point, making it an insufficient basis on which to discredit Stephens. *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997) (explaining that an ALJ meets her burden of minimal articulation so long as the reviewing court "can track the ALJ's reasoning"). Nevertheless, although one of Stephens's arrows hits the mark, it is simply not enough to cause her to win the match given the other substantial evidence in support of the ALJ's credibility determination reviewed *supra. See Skarbek*, 390 F.3d at 504 (concluding that an ALJ's error was harmless when it "would not affect the outcome of the case" (citing *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003))).

the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.

1993). If, however, testimony is "redundant," an ALJ does not need to independently evaluate it,

since the testimony is not a separate line of evidence.[29] *Id.*; *see also Books v. Chater*, 91 F.3d

972, 980 (7th Cir. 1996); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Brandenburg v.

Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2,

2005).

Here, the ALJ specifically found that Collins's testimony corroborated Stephens's

testimony concerning the limitations caused by her impairments; therefore, Collins's testimony

did not constitute a separate line of evidence that the ALJ needed to address. Indeed, when asked

if there was anything else she would add to Stephens's testimony, Collins replied in the negative.

(Tr. 287.) Thus, to the extent the ALJ found Stephens's testimony regarding her limitations "to

be untenable . . . [s]he necessarily found [Collins's] supporting testimony similarly not credible."

*Books*, 91 F.3d at 980. Given the numerous reasons for discrediting Stephens's testimony

articulated *supra*, any alleged peccadillo that the ALJ committed by declaring Collins's

testimony biased does not require a remand, particularly since the ALJ did not have to evaluate

this opinion in the first place. *See Shramek*, 226 F.3d at 814 (explaining that harmless errors are

those that do not ultimately impact the outcome of the determination).

---

[29] In *Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to reiterate, and thereby corroborate, [the claimant's] own testimony concerning his activities and limitations").

**IV. CONCLUSION**

For the foregoing reasons, the ALJ's decision is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Stephens.

SO ORDERED.

Enter for September 4, 2007.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

28